Matthew L. Marshall, Esq., State Bar No. 168013
MORRIS POLICH & PURDY LLP
1055 West Seventh Street, 24th Floor
Los Angeles, California 90017
Telephone:  (213) 891-9100
Facsimile:  (213) 488-1178
E-Mail:  mmarshall@mpplaw.com

Attorneys for Defendant
BOSTON SCIENTIFIC CORPORATION

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY MORSE,<br><br>          Plaintiff,<br><br>vs.<br><br>BOSTON SCIENTIFIC<br>CORPORATION,<br><br>          Defendant. | Case No.:  1:06-CV-00508-OWW-GSA<br><br>**BOSTON SCIENTIFIC'S FURTHER REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT [FRCP 56]**<br><br>**[Filed and served concurrently with:**<br><br>1. **Second Supplemental Declaration of Claude Clerc in Support of Boston Scientific Corporation's Motion For Summary Judgment;**<br>2. **Fourth Supplemental Declaration of Matthew L. Marshall in Support of Boston Scientific Corporation's Motion for Summary Judgment;**<br>3. **Supplemental Declaration of Lawrence E. Eiselstein, Ph.D., P.E. in Support of Motion for Summary Judgment;**<br>4. **Further Written Objections to "Supplemental Rule 26 Report and Further Declaration of Bruce Agle in Opposition to Motion for Summary Judgment and Exhibits" and Other Evidence**<br>5. **[Proposed] Order Re: Further Written Objections to "Supplemental Rule 26 Report and Further Declaration of Bruce Agle in Opposition to Motion for Summary Judgment and Exhibits" and Other Evidence** |

L0134400

BOSTON SCIENTIFIC'S FURTHER REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT [FRCP 56]

1

2   **Date: August 18, 2008**
    **Time: 2:00 p.m.**
3   **Place: Courtroom 3**

4   Trial Date:   September 16, 2008

5

6   **TO THE COURT, THE PLAINTIFF, AND HIS ATTORNEY OF RECORD:**

7      Defendant Boston Scientific Corporation ("Defendant") hereby submits its

8   Further Reply to Plaintiff Gary Morse's ("Plaintiff") Opposition to its Motion for

9   Summary Judgment or, in the alternative, Partial Summary Judgment.

10

11  Dated: August 12, 2008          MORRIS POLICH & PURDY LLP

12

13

14  By: _____

15          Matthew L. Marshall
        Attorneys for Defendant
16      BOSTON SCIENTIFIC CORPORATION

17

18

19

20

21

22

23

24

25

26

27

28

**BOSTON SCIENTIFIC'S FURTHER REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT [FRCP 56]**

# TABLE OF CONTENTS

I.   SUMMARY OF FURTHER ARGUMENTS ON REPLY.................................... 1

    A.   Chronology of the Numerous Opportunities Given to Plaintiff to Submit Evidence of Alleged Design and Warnings Defects. ...................... 1

    B.   The Plaintiff Has Again Failed to Submit Admissible Evidence of Product Defect. .............................................................................................. 3

II.  AGLE'S CALCULATIONS ARE WRONG ONCE AGAIN. ............................... 4

    A.   Mr. Agle's Opinions Lack Foundation and Fail to Meet the Threshold Requirements of Reliability Under *Daubert* ................................................ 4

    B.   Agle's Opinion that a Different Fatigue Design Standard Should Have Been Used Was Previously Raised in the Plaintiff's Initial Opposition...... 9

III. ALTERNATIVELY, THE COURT SHOULD ADOPT ITS TENTATIVE RULING IN FAVOR OF DEFENDANT ON THE ISSUE OF DESIGN DEFECT UNDER THE RISK/BENEFIT ANALYSIS AND RESTATEMENT THIRD, § 6(c)........................................................................... 10

    A.   The Plaintiff Has Still Offered No Evidence that Any Risks Inherent in the Design of the Wallstent® Outweighs the Benefits of the Design ... 10

IV.  THE PLAINTIFF HAS STILL FAILED TO SUBMIT EVIDENCE OF DISPUTED FACTUAL ISSUES ON CAUSATION AND RELIANCE IN REGARD TO THE FAILURE TO WARN CLAIM. ........................................... 12

    A.   No Evidence of Reliance and No Causation ............................................... 12

    B.   Although Dr. Shuman Will Not Commit to an Opinion as to Whether or Not the Risk of Fracture in Metallic Stents Was a Generally Known Risk in the Medical Community in 2004, he Does Opine that it was Known to Doctors That Use Stents. ............................................................ 16

V.   DR. McKENNA'S TESTIMONY SHOULD BE EXCLUDED IN ITS ENTIRETY ON THE ISSUE OF THE REASONS WHY HE SELECTED THE WALLSTENT®. ............................................................................................ 18

VI.  VIRTUALLY ALL OF THE DECLARATIONS IN OPPOSTION TO THE MOTION ARE INHERENTLY UNRELIABLE................................................. 19

VII. CONCLUSION.................................................................................................... 21

**BOSTON SCIENTIFIC'S FURTHER REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT [FRCP 56]**

## TABLE OF AUTHORITIES

1

### Cases

2

*Barker v. Lull Eng'g Co.,*
3
    20 Cal. 3d 413 (1978) ....................................................................................10

4

*Bojorquez v. House of Toys, Inc.*
5
    (1976) 62 Cal. App.3d 930 ...........................................................................18

6

*Carlin v. Superior Court*
    (1996) 13 Cal.4th 1104 ................................................................................12

7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
8
    509 U.S. 579 (1993)........................................................................................8

9

*Finn v. G.D. Searle,*
10
    35 Cal.3d 691 (1984) ...................................................................................16

11

*Johnson v. American Standard*
12
    (2008) WL 878933.......................................................................................17

13

*Kirsch v. Picker Int'l,*
14
    753 F.2d 670 (8th Cir.1985) ........................................................................13

15

*Morson v. Superior Court*
16
    (2001) 90 Cal.App.4th 775 ..........................................................................10

17

*Motus v. Pfizer Inc.*
    196 F.Supp.2d 984 (C.D.Cal.,2001)..........................................................13, 14, 15
18

*Persons v. Salomon North America,*
19
    217 Cal.App.3d 168 (1990) .........................................................................16

20

*Plenger v. Alza Corp.*
21
    (1992) 11 Cal.App.4th 349 ..........................................................................18

22

*Plummer v. Lederle Laboratories,*
23
    819 F.2d 349 (2d Cir.1987) .........................................................................13

24

*Soule v. General Motors Corp.,*
25
    8 Cal. 4th 548 (1994)...................................................................................10

26

*Stanback v. Parke, Davis & Co.,*
27
    657 F.2d 642 (4th Cir.1981) ........................................................................13

28

*Stevens v. Parke, Davis & Co.*

# TABLE OF AUTHORITIES

(1973) 9 Cal.3d 51 .................................................................................. 13

**Other Authorities**

63A Am. Jur. 2d Products Liability § 1222 ..................................................... 16

**BOSTON SCIENTIFIC'S FURTHER REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT [FRCP 56]**

## I.   SUMMARY OF FURTHER ARGUMENTS ON REPLY.

### A.   Chronology of the Numerous Opportunities Given to Plaintiff to Submit Evidence of Alleged Design and Warnings Defects.

The Court has provided the Plaintiff with multiple opportunities to defeat the pending Motion for Summary Judgment. Each time, the Plaintiff has failed to submit admissible evidence to create a trial issue of fact, and because of this, the Motion should be granted.

First, the Plaintiff was granted leave to submit his opposition brief on a modified briefing schedule, based on counsel's representation that the Plaintiff did not have enough time to prepare the opposition and complete the necessary review of the device by his experts, despite the fact that the Plaintiff had possession of the devices in question ("the Wallstent® metallic stents") almost exclusively throughout the entire litigation. [See Exhibit "D" to Third Supplemental Declaration of Matthew L. Marshall in Support of Motion for Summary Judgment.]

Second, at the initial hearing on the Motion on June 30, 2008, the Plaintiff was granted leave to submit a supplemental declaration by Dr. Robert McKenna as to any claim based on alleged warnings defect to specifically to address the issue of whether Dr. McKenna read and relied on the warnings that accompanied the devices when they were implanted in March 2004 and December 2004, respectively. [Reporter's Transcript of Proceedings at 11:10-25, 12:1-2, 12:24-25, 13:1, and 13:13-19, *Summary Judgment* Motion, June 30, 2008, a true and correct copy of which is attached as Exhibit "A" to the Second Supplemental Declaration of Matthew L. Marshall in Support of Boston Scientific's Motion for Summary Judgment].

Third, at the initial hearing on the Motion on June 30, 2008, the Court also permitted the Plaintiff to submit a supplemental declaration by his technical expert Bruce J. Agle to determine whether his calculations in assessing the average hardness of the wires used in the Wallstent® metallic stent were accurate. [Reporter's Transcript of Proceedings at 22:12-23:21, *Summary Judgment* Motion, June 30, 2008, Exhibit "A" to

1   the Second Supplemental Declaration of Matthew L. Marshall in Support of Boston

2   Scientific's Motion for Summary Judgment]. Notwithstanding this additional time, the

3   Plaintiff finally had to admit that his expert's opinions regarding alleged manufacturing

4   defect were unsupportable, and his expert has now admitted were without merit.

5   [Second Supplemental  Declaration of Bruce J. Agle, PE in Support of Plaintiff's

6   Opposition to Motion for Summary Judgment at 2:9-20].

7       Fourth, after Mr. Agle's admitted that his calculations on the average hardness of

8   the wires used in the Wallstent® metallic stents were inaccurate, and that there was no

9   evidence of a manufacturing defect, the Court then permitted the Plaintiff to file an

10  additional supplemental declaration by Mr. Agle. In his initial declaration/report, Mr.

11  Agle stated his opinion that the Wallstent® metallic stent also contained a design defect

12  in the fatigue cyclic load testing for the device, which he acknowledges in his Second

13  Supplemental Declaration at 2:21-25. In contrast to his initial declaration, Mr. Agle

14  actually cited some facts to support this opinion on design defect in his Second

15  Supplemental Declaration, wherein he cited an article by *Amiri, et al*. that set forth the

16  degree to which the cross-sectional area of the trachea was reduced during contraction.

17  Based on this article, Mr. Agle opined that the fatigue cyclic load testing for the

18  Wallstent® was inadequate.

19      In addition to permitting the Plaintiff to file this supplemental declaration, the

20  Court also permitted the Plaintiff to add one more additional opinion by Mr. Agle on

21  causation. [See Reporter's Transcript of Proceedings ("R.T."), *Ex Parte Request to*

22  *Submit New Evidence*, July 23, 2008, Exhibit "G" to the Fourth Supplemental

23  Declaration of Matthew L. Marshall at 34:13-18, filed concurrently herewith].

24      In other words, the Plaintiff was permitted to re-address the issue alleged design

25  defect for a second time, despite the fact that the issue was previously set forth in Mr.

26  Agle's initial report and declaration in opposition to the initial motion, and briefed in the

27  opposition and reply papers. The Plaintiff was given this additional opportunity despite

28  the fact that the Defendant's document production was substantially completed by

1  December 21, 2007, and the deposition of Defendant's person most knowledgeable
2  regarding manufacturing and design issues was completed on April 22, 2008. [See
3  Fourth Declaration of Matthew L. Marshall in Support of Motion for Summary
4  Judgment at ¶5].    However, notwithstanding the many opportunities given to the
5  Plaintiff by the Court, the "new" design defect opinion is without merit because it is
6  (again) based on inaccurate mathematical calculations.

7  **B.    The Plaintiff Has Again Failed to Submit Admissible**
8  **Evidence of Product Defect.**

9  Despite his many chances, the Plaintiff has still failed to raise any triable issues of
10  material fact on the design defect and warning defect allegations, for the following
11  reasons:

12  1.    Mr. Agle has again failed to perform the proper mathematical
13  calculations to support his opinion regarding an alleged design defect;

14  2.    Plaintiff's medical expert, Robert Shuman, MD recently testified at
15  his deposition on August 7, 2008 that:

16  •    There are situations where metallic stents may be the only treatment
17       options for some patients.

18  •    Metallic stents have their own benefits that they can give to
19       particular classes of patients.

20  •    Metallic stents may be the best treatment for some patients despite
21       the fact that one of the risks associated with is stent fracture.

22  •    Despite the known risk of fracture in metallic stents as of March of
23       2004, the Wallstent® metallic stent was an appropriate treatment
24       option for Gary Morse, and it was reasonable for Dr. McKenna to
25       prescribe it for him.  This testimony establishes that there was no
26       design defect as a matter of law under the risk/benefit analysis of
27       Restatement (Third) section 6(c).

28  3.    The Plaintiff failed to submit additional evidence on the issue of

1   reliance.  There is still no evidence that Dr. McKenna relied on the information that
2   accompanied the device, or that any insufficiency in that information caused the
3   Plaintiff's injuries.  Absent evidence of the critical evidence of reliance, any failure to
4   warn claim must be adjudicated in favor of Defendant as a matter of law;

5          4.    Dr. Shuman has now testified at his deposition that as of March
6   2004, the risk of fracture in metallic stents was a known risk to user of stents, which
7   would include Dr. McKenna.

8          4.    Dr. McKenna's supplemental declaration contradicts his prior
9   testimony, and is based on erroneous foundational facts, which render all of Dr.
10  McKenna's testimony totally unreliable.  Specifically, all of Dr. McKenna's testimony
11  about the reasons why he did not use a silicone stent on Gary Morse (*e.g.* risk of vocal
12  chord injury, risk of stent migration) are contradicted by his own medical records, which
13  unequivocally establish that Dr. McKenna's preferred choice of stent for the treatment
14  of Gary Morse in March 2004, and in December 2004, was in fact the Polyflex®
15  silicone stent.  For these reasons, the McKenna declaration should be excluded.

16         Despite giving Plaintiff every possible opportunity to defeat the motion, the
17  Plaintiff has still failed to submit admissible evidence that a triable issue of material
18  exists.  As such, the Motion should be granted in its entirety.

19  **II.    AGLE'S CALCULATIONS ARE WRONG ONCE AGAIN.**

20         **A.    Mr. Agle's Opinions Lack Foundation and Fail to Meet the**
21                **Threshold Requirements of Reliability Under *Daubert***

22         As was the case in regard to his opinion regarding an alleged manufacturing
23  defect, Mr. Agle has again failed to conduct his mathematical calculations accurately.
24  The result, as was the case previously, is an inadmissible opinion that lacks foundation,
25  and which is objectively inaccurate.  Because of these inaccuracies, the opinion on the
26  alleged design defect falls of its own weight and should be excluded.  It is appropriate
27  then, that any claim of an alleged design defect should be adjudicated in favor of
28  Defendant.

In both the 2nd Supp. Agle Dec. and in the Supp. Rule 26 Agle Report, Mr. Agle cites and relies on an article entitled "Structure of the guinea-pig trachea at rest and in contraction" [*Amiri, M and Gabella, G; Anat Embryol (1988) 178:389-397*] ("*Amiri* article").

Mr. Agle states in his testimony that the *Amiri* article concluded the following:

- "The lumen of the trachea is reduced 51% during contraction in the cervical portion of the trachea"; and

- "The lumen of the trachea is reduced 39% during contraction in the thoracic portion of the trachea."

[2nd Supp. Agle Dec. at 3:1-9; Supp. Rule 26 Agle Report at 2:21-3:2]

However, Mr. Agle's account of the *Amiri* article is incomplete and does not adequately or completely describe the conclusions from the article on which Mr. Agle, in turn, bases his opinion. The *Amiri* authors actually concluded that the *cross-sectional area* (not to be confused with the diameter) of the lumen of the trachea is reduced 51% during contraction in the cervical portion of the trachea; and that the *cross-sectional area* of the lumen of the trachea is reduced 40% during contraction in the thoracic portion of the trachea. [See Exhibit 2 to the Supp. Rule 26 Agle Report and Exhibit 2 to the 2nd Supp. Agle Dec at p. 390, ¶¶ (iii) and (iv)]. The fact that the *Amiri* authors were referencing the *cross-sectional area* of the lumen of the trachea is critical to any opinion regarding the appropriate degree of cyclic load testing in this case.

In the *Amiri* article, the authors based their conclusions on the fact that during contraction, the average cross-sectional area of the cervical part of the tracheal lumen was reduced by 2.28 mm$^2$, from 4.46 mm$^2$ down to 2.18 mm$^2$. In other words, the cross-sectional area in the cervical part of the trachea was reduced by 51% (i.e. 2.28 mm$^2$/4.46 mm$^2$). A 51% *reduction* in area means that the contracted cross-sectional area of the cervical trachea was 49% of its original area.

The *Amiri* article reported a lesser reduction in cross-sectional area of the thoracic part of the trachea. The article indicates that during contraction, the average cross-

1  sectional area of the thoracic part of the tracheal lumen was reduced by 1.11 mm², from
2  2.80 mm² down to 1.69 mm². In other words, the cross-sectional area in the thoracic
3  part of the trachea was reduced by 40% (i.e. 1.11 mm²/2.80 mm²). A 40% *reduction* in
4  area means that the contracted cross-sectional area of the thoracic trachea was 60% of
5  its original area.

6      The data from the *Amiri* article is what Mr. Agle bases his opinions regarding
7  design defect in this case. Based on the *Amiri* article, *i.e.* the standard enunciated by
8  Mr. Agle, BSC's tracheal stent testing on the Wallstent® was not only appropriate, but
9  were within Mr. Agle's standard.

10      Mr. Agle also cites an incorrect test protocol for axial fatigue testing for the
11  Wallstent® at issue in this case. The actual testing protocol for axial fatigue testing for
12  the Wallstent® at issue in this case is from the year 2001, and is set forth in the seven-
13  page document entitled "Stent Axial Fatigue Test", Q323381-00 Rev/Ver. AB,
14  BSC07156-BSC07162, and also in the three-page document entitled "Stent Axial
15  Fatigue Test", Q323381-00, Version AA, BSC07163-BSC07165. These documents
16  were previously produced in this litigation.

17      The aforementioned Stent Axial Fatigue Testing documents show that the BSC
18  Wallstent® design was tested with up to a 30% reduction of its original diameter.
19  Because area is proportional to diameter squared, this corresponds to a 51% reduction in
20  cross-sectional area during the test, which is precisely the maximum area reduction
21  reported in the *Amiri* article. In other words, during these tests, the stent diameter was
22  reduced to 70% of its original diameter and thus 49% of its original cross-sectional area
23  (i.e., 100% original area − 51% reduction = 49% final area). A table of Axial Fatigue
24  Test Conditions at BSC07158 that specifies a minimum diameter for fatigue testing of
25  70% ("0.70 $D_e$o"), which corresponds to a 30% reduction in stent diameter and a 51%
26  reduction in cross-sectional area.

27      Mr. Agle incorrectly refers to the fatigue testing of the Wallstent® as involving a
28  25% "change in the transverse area". [Supp. Rule 26 Agle Report at 3:5-8, "In the

1 Schneider original fatigue testing of the stent the change in the transverse area was

2 reported as 25%."].   The fatigue testing protocol for the Wallstent® [BSC07156-

3 BSC07162] specified a change in the *diameter* of the stent, not the "transverse area" of

4 the stent.   Mr. Agle has confused the change in diameter with the change in cross-

5 sectional area.   This is not a minor error because cross-sectional area is proportional to

6 diameter squared.

7    As indicated in the *Amiri* article relied on by Mr. Agle, the authors observed that,

8 during contraction, the cross-sectional area of the cervical part of the trachea was

9 reduced by 51%.   By confusing reduction in area with reduction in the diameter of the

10 Wallstent® during axial fatigue testing, Mr. Agle made a critical error in his

11 mathematics by not accounting for the square root relationship between diameter and

12 area.

13    As to properly interpreting the reduced cross-sectional area of the contracted

14 cervical part of the trachea, as reported in the *Amiri* article, Agle should have taken the

15 square root of 0.49 (i.e., the cervical trachea had contracted to 49% of its original cross-

16 sectional area) to determine the reduced diameter at which axial fatigue testing was

17 appropriate for the Wallstent® in tracheal applications.   The square root of 0.49 is 0.70

18 (i.e., a reduced diameter equal to 70% of the original diameter).   This is precisely the

19 reduced diameter ("0.70 $D_e$o") specified in the test protocol for tracheal stents.

20 However, Mr. Agle did not come to this conclusion because he, again, did not do the

21 math correctly.[1]

22    As to properly interpreting the reduced cross-sectional area of the contracted

23 thoracic part of the trachea, as reported in the *Amiri* article, Agle should have taken the

24

25 [1] The reduction of the cross-sectional area of the thoracic portion of the trachea as set forth in the *Amiri*
article was 40% (60% of its original area), which is less than the reduction of the cross-sectional area
26 of the cervical portion of the trachea, which was 51% (49% of its original area).   Accordingly, the
reduced diameter at which axial fatigue testing was appropriate for the Wallstent® in tracheal
27 applications in the thoracic area would have been the square root of .60, which is .77.   This would
28 warrant testing to a 23% reduction in diameter, well within the 30% testing conducted by Boston

1  square root of 0.49 (i.e., the cervical trachea had contracted to 49% of its original cross-
2  sectional area) to determine the reduced diameter at which axial fatigue testing was
3  appropriate for the Wallstent® in tracheal applications.  The square root of 0.49 is 0.70
4  (i.e., a reduced diameter equal to 70% of the original diameter, or testing to a 30%
5  compression).  This is precisely the reduced diameter ("0.70 $D_e$o") specified in the test
6  protocol for tracheal stents.  However, Mr. Agle did not come to this conclusion because
7  he, again, did not do the math correctly.

8      The axial fatigue test protocol, i.e. the design of the Wallstent®, calls for testing to
9  a 30% reduction of its original diameter (i.e., down to 70 % of its original diameter).
10  Thus, under Mr. Agle's standard, as set forth in the *Amiri* article, the axial fatigue
11  testing of the Wallstent® fully takes into account the reduction in the cross-sectional
12  area of the cervical and thoracic parts of the trachea, as described in the article.

13

14      Mr. Agle's analysis lacks foundation and his testing methodology fails to meet
15  the threshold requirements for reliability required under Federal Rules of Evidence,
16  Rule 702 (*See also*, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579
17  (1993).)  Under FRE 702 the threshold requirements for reliability of expert testimony
18  are that: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the
19  product of reliable principles and methods; and (3) the witness has applied the principles
20  and methods reliably to the facts of the case.

21      Under FRE, Rule 702 and *Daubert*, the entire opinion testimony by Mr. Agle
22  should be excluded because (1) it was based on insufficient facts or data, and (2) it is
23  based on an unreliable misapplication of principles and methods to the facts of the case,
24  and such, fails to meet the threshold requirements of Rule 702 and *Daubert*.

25      Had Agle simply accounted for the square relationship between area and
26  diameter, he would have concluded that the fatigue cyclic load testing for the

27

28  Scientific.

L0134400                                -8-

1   Wallstent® was consistent with the standard he identified in the *Amiri* article.

2   **B.    Agle's Opinion that a Different Fatigue Design Standard Should Have**

3   **Been Used Was Previously Raised in the Plaintiff's Initial Opposition.**

4   In the Plaintiff's initial Opposition brief, Mr. Agle provided an opinion that the

5   Wallstents® contained a design defect, by stating that they should have been designed

6   to withstand cyclic loads greater than the 25% compression, and number of load cycles

7   greater than the 1 asthma event every day for 10 years times a safety factor of 14 (i.e.

8   50,000 cycles) mentioned in the Schneider (USA) design validation report dated August

9   9, 1993. In his initial report, Mr. Agle did not provide any support or basis for what the

10  fatigue design standard should be for an airway stent. Nor did Mr. Agle suggest what

11  the appropriate fatigue design parameters should be for such devices in general, or for

12  Mr. Morse's airway stent specifically.[2]

13  In Reply to the Plaintiff's Opposition, Defendant and its engineering expert,

14  Lawrence Eiselstein, Ph.D objected to Agle's opinion regarding design defect for the

15  aforementioned reasons. [See Defendant's Reply to Plaintiff's Opposition to Motion for

16  Summary Judgment at Section III.B, Declaration of Lawrence Eiselstein, Ph.D in

17  Support of Motion for Summary Judgment at 4:5-20]

18  Despite the fact that the issue was previously raised, briefed and argued at the

19  initial hearing on the Motion for Summary Judgment on June 30, 2008, the Court

20  allowed the Plaintiff and Mr. Agle an additional opportunity to address the issue. Mr.

21  Agle has utterly failed in this endeavor, and has again failed to do his math correctly. In

22  addition, since the *Amiri* article is the only 'standard' cited by Mr. Agle in his

23  supplemental report, the Plaintiff is back at square one, and has failed to identify any

24  other specific cyclic testing standards that the design of the Wallstent® has allegedly

25

26

27  [2] In his Supplemental Report, Mr. Agle has admitted that he had previously raised this opinion in his initial Report.

28

1  failed to meet.  For these reasons, any claim regarding an alleged design defect should

2  be adjudicated in Defendant's favor.

3  **III.   ALTERNATIVELY, THE COURT SHOULD ADOPT ITS TENTATIVE**

4  **RULING IN FAVOR OF DEFENDANT ON THE ISSUE OF DESIGN**

5  **DEFECT UNDER THE RISK/BENEFIT ANALYSIS AND RESTATEMENT**

6  **THIRD, § 6(C).**

7  In its initial Reply to the Plaintiff's Opposition to this Motion, Defendant argued

8  that under the Restatement Third, Section 6(c), any claim regarding an alleged design

9  defect should be adjudicated in Defendant's favor.  Despite, the additional opportunity

10  given to the Plaintiff by the Court, there is still no evidence that any risks inherent in the

11  design of the Wallstent® outweighed its benefits.

12  **A.   The Plaintiff Has Still Offered No Evidence that Any Risks Inherent in**

13  **the Design of the Wallstent® Outweighs the Benefits of the Design**

14  Generally, a product is defective in design if the risk of danger inherent in the

15  challenged design outweighs the benefits of such design." *Barker v. Lull Eng'g Co.*, 20

16  Cal. 3d 413, 429, 430 (1978).[3]  In this case, neither the Plaintiff's medical expert nor his

17  treating physician has provided any testimony that establishes that the potential risks

18  associated with metallic stents in general, or with respect to the Wallstent® specifically,

19  outweighed the benefits afforded by metallic stents.   In fact, Dr. Shuman proffers an

20  opinion that Dr. McKenna's decision to treat Plaintiff with the Wallstent® was the

21  correct one, and in so doing, raises the inference that the benefits afforded by the

22  Wallstent® outweighed any risks associated therewith.   [Declaration of Robert L.

23  Shuman in Support of Plaintiff's Opposition to Motion for Summary Judgment at 3:23-

24

---

25  [3] The "Consumer Expectations Test" to establish alleged design defects is not available to plaintiffs in

26  a case involving design defect claims involving medical devices. *Morson v. Superior Court* (2001) 90
Cal.App.4th 775).  Where expert opinions on the merits of the design are necessary to explain "...

27  obscure components ... under ... complex circumstances ..." outside the ordinary experience of
consumers, the consumer expectation test does not apply. *Soule v. General Motors Corp.*, 8 Cal. 4th

28  548, 570 (1994); *Morson* supra, 90 Cal.App.4th at 793-95.

L0134400                                          -10-

25, 4:1-6].

In addition, the Restatement (Third) section 6 (c) provides that:

> A prescription drug or medical device is not reasonably safe
> due to defective design if the foreseeable risks of harm posed
> by the drug or medical device are sufficiently great in relation
> to its foreseeable therapeutic benefits that reasonable health-
> care providers, knowing of such foreseeable risks and
> therapeutic benefits, would not prescribe the drug or medical
> device for any class of patients.

Dr. Shuman also recently testified at his deposition on August 7, 2008, that

- The use of a Wallstent® by Dr. McKenna was the best treatment available for Gary Morse at that time (Deposition of Robert Shuman, MD, Exhibit "H" to Fourth Supplemental Declaration of Matthew L. Marshall at 78:3-7);

- There are situations where metallic stents such as the Wallstent® may be the only treatment options for some patients (Deposition of Robert Shuman, MD, Exhibit "H" to Fourth Supplemental Declaration of Matthew L. Marshall at 78:8-11);

- Metallic stents have their own benefits that they can give to particular classes of patients (Deposition of Robert Shuman, MD, Exhibit "H" to Fourth Supplemental Declaration of Matthew L. Marshall at 78:12-16);

- For some patients, metallic stents may still be the best treatment option despite the fact that some of the risks associated with them are formulation of granulation tissue, migration and fracture (Deposition of Robert Shuman, MD, Exhibit "H" to Fourth Supplemental Declaration of Matthew L. Marshall at 78:17-22);

- In light of the known risk of fracture of metallic stents as of March of 2004, that it was not unreasonable for Dr. McKenna to prescribe the Wallstent® for Gary Morse at that time (Deposition of Robert Shuman, MD, Exhibit

"H" to Fourth Supplemental Declaration of Matthew L. Marshall at 78:23-25, 79:1-9);

There is no dispute in this case that the risks associated with metallic tracheal stents were not so great in relation to their benefits such that Drs. McKenna and Shuman would not have prescribed them for *any class of patients*. Quite to the contrary, both of them have testified that there are classes of patients that achieve great benefits from the use of metallic stents, and that Morse fell within that class. Simply put, there is no evidence to support a claim for design defect under the risk-benefit test.

Finally, it remains undisputed that Boston Scientific provided the FDA with the required design, manufacturing, and quality assurance/quality control documentation for the Wallstent® in accordance with the FDA 510(k) process for implantable devices and the Wallstent®, and received clearance from the FDA to market the product. [SSUF 33] It remains undisputed, as no admissible evidence has been presented to show otherwise, that in regard to the design of the Wallstent®, Boston Scientific acted within the applicable standard of care applicable to a medical device manufacturer. And it remains undisputed that the Plaintiff has not identified alternative designs in the Wallstent® that could have prevented the occurrence of the incident(s) or his alleged injuries. [SSUF 5]. The claim for negligent design defect must be resolved in Defendant's favor.

## IV. THE PLAINTIFF HAS STILL FAILED TO SUBMIT EVIDENCE OF DISPUTED FACTUAL ISSUES ON CAUSATION AND RELIANCE IN REGARD TO THE FAILURE TO WARN CLAIM.

### A.   No Evidence of Reliance and No Causation

The supplemental declaration by Dr. McKenna fails to establish two critical elements of a failure to warn claim: reliance and causation.

California law is clear that a manufacturer of medical devices only has a duty to warn <u>physicians</u> of risks associated with the product, which are known or reasonably scientifically knowable at the time of distribution. The manufacturer has no duty to warn the patient directly. (*See Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1116,

1    (emphasis in original); *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65.)

2         A plaintiff asserting causes of action based on a failure to warn must prove not

3    only that no warning was provided or the warning was inadequate, but also that the

4    inadequacy or absence of the warning caused the plaintiff's injury. *Motus v. Pfizer Inc.*

5    196 F.Supp.2d 984 (C.D.Cal.,2001). *Plummer v. Lederle Laboratories*, 819 F.2d 349,

6    358 (2d Cir.1987) (applying California law); *Kirsch v. Picker Int'l,* 753 F.2d 670, 671

7    (8th Cir.1985); *Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 645 (4th Cir.1981).

8         In its Reply to Plaintiff's Opposition to this Motion, Defendant argued that since

9    there was no evidence (at that time) that Dr. McKenna actually read the Instructions for

10   Use that accompanied the Wallstent®, the Plaintiff's failure to warn claim could not be

11   sustained because neither causation nor reliance could be established if Dr. McKenna

12   had not read the warnings [Defendant's Reply to Plaintiff's Opposition to Motion for

13   Summary Judgment at Section III.D].

14        At the Plaintiff's request, the Court permitted the Plaintiff to obtain additional

15   testimony from Dr. McKenna on whether or not he read the Instructions for Use.  In his

16   supplemental declaration, Dr. McKenna testified that he had read the Instructions for

17   Use which accompanied the Wallstent® that he implanted in Gary Morse's trachea

18   before performing the implant in March, 2004 [Supplemental Declaration of Robert

19   McKenna, Jr., M.D. in Support of Plaintiff's Opposition, at 2:5-8.]

20        Defendant has objected to this testimony as a 'sham' declaration because, at his

21   deposition, Dr. McKenna was asked by Plaintiff's counsel whether he was familiar with

22   not just promotional materials that accompanied the Wallstent, but *any kind of materials*

23   *relating to the Wallstent particularly.*  Dr. McKenna said he couldn't recall seeing any.

24   [Deposition Testimony of Robert J. McKenna, Jr. MD at 35:6-14, a true and correct

25   copy of which is attached hereto as Exhibit "B" to the Second Supplemental Declaration

26   of Matthew L. Marshall in Support of Boston Scientific's Motion for Summary

27   Judgment].

28        Notwithstanding the fact that Dr. McKenna has seemingly changed, or at least

1  embellished, his prior testimony, a far more significant issue is the testimony that is

2  lacking from the supplemental declaration. Specifically, Dr. McKenna does not testify

3  that had warnings regarding stent fracture been included in the Instructions for Use that

4  he would *not* have prescribed the Wallstent® to treat Gary Morse's trachealmalacia.

5  Dr. McKenna instead, testifies that, "[h]ad the risk of tracheal stents could fracture been

6  disclosed, I would have shared that information with Mr. Morse."    [Supplemental

7  Declaration of Robert McKenna, Jr., M.D. in Support of Plaintiff's Opposition, at 2:10-

8  11.]

9       Dr. McKenna also never testified that he relied on the Instructions for Use that

10  accompanied the Wallstent® in making his decision to prescribe the device to the

11  Plaintiff.  In fact, quite to the contrary, he testified that he based his decision to use the

12  metallic Wallstent® based upon his opinion that of the three treatment options that he

13  felt were available to Gary Morse in 2004 (tracheoplasty, an implanted metallic stent, or

14  an implanted silicone stent), the Wallstent® was the therapy of "last resort", and that the

15  risks associated with tracheoplasty and silicone stents were prohibitive. [Declaration of

16  Robert McKenna, Jr., M.D. in Support of Plaintiff's Opposition, at 2:21-24, 3:1-20].

17       The *Motus* case, *supra*, is directly on point as to the reliance issue.   *Motus*

18  involved allegations that Pfizer failed to provide warnings in the package insert of its

19  drug *Zoloft* that it could cause an increased risk in suicide during the first few weeks of

20  drug treatment, which it had not.  In *Motus*, the Court refused to conclude that a triable

21  issue of fact remained on the issue of whether the treating doctor would have refrained

22  from prescribing Zoloft to the plaintiff's deceased husband if the warning regarding

23  suicide had been included.   In granting Pfizer's motion for summary judgment on a

24  failure to warn claim, the Court reasoned:

25

26               Indeed, Plaintiff never asked Dr. Trostler what could have been
             (depending on the answer) the following dispositive question:
27             "Dr. Trostler, if even without reading the package insert you
             had become aware that Pfizer itself had disclosed that
28

[whatever is the precise warning regarding suicide that plaintiff considers necessary], would you have prescribed Zoloft to Mr. Motus?"

Plaintiff's lawyer did ask Dr. Trostler: "If you had been told that Zoloft can cause an increased risk in suicide during the first few weeks of drug treatment, is that the kind of information you would pass on to your patients?" Dr. Trostler responded, "Yes."

Plaintiff argues that this response creates a genuine issue as to whether Dr. Trostler would have changed his behavior had Pfizer provided adequate warnings. The Court does not agree. Given that this case is about the sufficiency of the warnings accompanying Zoloft, the appropriate question would have been: "If Zoloft's package insert had contained a warning that Zoloft can cause an increased risk in suicide during the first few weeks of drug treatment, would you have prescribed Zoloft to Mr. Motus?" But Plaintiff's lawyer did not ask this question, and at the hearing, in response to the Court's inquiry why not, he displayed commendable candor in acknowledging that he, and probably defense counsel as well, were afraid of how Dr. Trostler might respond. The testimony Dr. Trostler did give does not establish that if that warning had been provided, he would not have prescribed Zoloft or would have told Mr. Motus something other than what he did say.

*Motus v. Pfizer, Inc.* 196 F.Supp.2d 984, 996-997 (C.D.Cal.,2001.)

In this case, the testimony by Dr. McKenna is eerily similar to that of Dr. Trostler in the *Motus* case. Like Dr. Trostler, Dr. McKenna did not testify that had the warnings that accompanied the Wallstent® contained a warning regarding the risk of stent fracture that he would not have prescribed the stent for Mr. Morse. Rather, he testified (at the behest of Plaintiff's counsel) just as Dr. Trostler did in the *Motus* case, that had the warning regarding stent fracture been included in the Instructions for Use, he would have communicated this to Mr. Morse.

Finally, the Plaintiff has not himself testified that had that risk of potential risk fracture been disclosed to him by Dr. McKenna, that he would not have consented to the

1 | implant.

2 | In other words, there is no evidence that if the Instructions for Use had contained
3 | a specific warning regarding the potential risk of stent fracture, the device would not
4 | have been prescribed to or implanted in Plaintiff.  There is no evidence of reliance.
5 | There is no evidence of causation.  Thus, there is no admissible evidence of a warnings
6 | defect.

7 | Finally, as argued in the initial Motion and Reply, Plaintiff has not designated a
8 | warnings expert to testify regarding the adequacy of the warnings that accompanied the
9 | Wallstents®.  The adequacy of a warning is a subject for expert testimony. (See e.g.,
10 | *Finn v. G.D. Searle,* 35 Cal.3d 691, 703-04 (1984); *Persons v. Salomon North America,*
11 | 217 Cal.App.3d 168,176-77 (1990).)   In a case such as this one involving complex
12 | medical issues and an implantable medical device, any alleged warnings defect would
13 | have to be established by way of expert testimony.  "It is necessary to have expert
14 | testimony as to the adequacy of a warning where the adequacy of the warning is not
15 | obvious to the ordinary lay person or where a lay person could have no knowledge at all
16 | as to the dangers inherent in the product and what constitutes an inadequate warning."
17 | (63A Am. Jur. 2d Products Liability § 1222.)  Here, for example, a warnings expert with
18 | a medical background is needed to opine as to whether the "Indications for Use of the
19 | Wallstents®" and the warnings and precautions set forth therein were sufficient, and
20 | further, that the lack of such warnings were the proximate cause of plaintiff's alleged
21 | injuries.  Since there is no expert to testify in regard to the adequacy of the warning, the
22 | necessity of a warning, proposed alternative warnings, and the Defendant's ability under
23 | law to revise its warnings in the regulatory context of the Food, Drug & Cosmetic Act,
24 | the Plaintiff is unable to establish a defective warnings claim as a matter of law.

25 | **B.** | **Although Dr. Shuman Will Not Commit to an Opinion as to Whether**
26 | | **or Not the Risk of Fracture in Metallic Stents Was a Generally Known**
27 | | **Risk in the Medical Community in 2004, he Does Opine that it was**
28 | | **Known to Doctors That Use Stents.**

1    Dr. Shuman was specifically and repeatedly asked at his deposition of August 7,
2    2008 whether he could state to a reasonable degree of medical probability whether or
3    not the risk of fracture in metallic stents was a generally known risk in the medical
4    community as of March 2004.  When asked if it was a generally known risk, he replied.
5    "I don't even know that I can say yes to that."  (Deposition of Robert Shuman, MD,
6    Exhibit "H" to Fourth Supplemental Declaration of Matthew L. Marshall at 88:18-23).
7    When asked if the risk was *not* a generally known risk to the medical community, he
8    replied, "I don't think I can answer that question as phrased." (Deposition of Robert
9    Shuman, MD, Exhibit "H" to Fourth Supplemental Declaration of Matthew L. Marshall
10   at 90:17-22).  When asked if the risk was *not* a generally known risk to the medical
11   community of thoracic surgeons, he said that it was "debatable." (Deposition of Robert
12   Shuman, MD, Exhibit "H" to Fourth Supplemental Declaration of Matthew L. Marshall
13   at 90:25-91:7).  However, upon further examination, Dr. Shuman finally relented and
14   conceded that not only did the risk exist, but also that it was known by people using
15   stents as of March 2004.  (See Deposition of Robert Shuman, MD, Exhibit "H" to
16   Fourth Supplemental Declaration of Matthew L. Marshall at 91:21-25, 92:1, 92:11-19).

17   He also conceded that he agreed with Dr. Susanto's testimony (cited in the
18   original Motion) that "stent fracture is almost a fact of life...like bleeding, infection and
19   other complications related to stents, yes." (Deposition of Robert Shuman, MD, Exhibit
20   "H" to Fourth Supplemental Declaration of Matthew L. Marshall at 128:4-7).

21   All of this testimony is consistent with the testimony by Dr. DeMeester in regard
22   to the issue of whether or not there was a duty as of March 2004 to warn Dr. McKenna
23   of the then known risk of fracture in metallic stents.  Based on this testimony and the
24   controlling authority on the learned intermediary and sophisticated user doctrines, there
25   was no duty to warn of the known risk. See, e.g., *Johnson v. American Standard* (2008)
26   WL 878933, explaining that "a manufacturer is not liable to a sophisticated user of its
27   product for failure to warn of a risk, harm, or danger if the sophisticated user knew or
28   should have known of that risk, harm or danger."; See also *Plenger v. Alza Corp.* (1992)

1   11 Cal.App.4th 349, 362, ("We are aware of no authority which requires a manufacturer

2   to warn of a risk which is readily known and apparent to the consumer, in this case the

3   physician."); and "There is no need to add a warning when 'the danger, or potentiality

4   of danger is generally known and recognized." *Bojorquez v. House of Toys, Inc.* (1976)

5   62 Cal. App.3d 930, 933-34.

6   **V.   DR. MCKENNA'S TESTIMONY SHOULD BE EXCLUDED IN ITS**

7   **ENTIRETY ON THE ISSUE OF THE REASONS WHY HE SELECTED**

8   **THE WALLSTENT®.**

9        Dr. McKenna testified in his initial Declaration in opposition to the Motion, that

10  he recommended the metallic tracheal stent (the Wallstent®) to Mr. Morse because of

11  the many risks associated with the silicone stent, which included risks of vocal chord

12  injury, mucous accumulation, and stent migration.  See Declaration of Robert McKenna,

13  Jr. M.D. in Support of Plaintiff's Opposition to Motion for Summary Judgment at 3:3-

14  17. He also testified that the use of a metallic tracheal stent was "the therapy of last

15  resort" that was "most appropriate for Mr. Morse."   See Declaration of Robert

16  McKenna, Jr. M.D. in Support of Plaintiff's Opposition to Motion for Summary

17  Judgment at 3:17-20.

18       This testimony was offered to rebut the contention by Boston Scientific that Dr.

19  McKenna had not heeded the Instructions for Use, and had prescribed the Wallstent®

20  inconsistently with the Indications for Use, which provided that "*This device is intended*

21  *for use in the treatment of tracheobronchial strictures produced by malignant*

22  *neoplasms or in benign strictures of fistulas after all alternative therapies have been*

23  *exhausted.*" (UF No. 24)(emphasis added).

24       However, Dr. McKenna had created these facts out of whole cloth.   Dr.

25  McKenna's own medical records show that his initial preferred treatment for Gary

26  Morse was the implant of a *silicone stent*.  In documents produced by the Plaintiff in

27  discovery, specifically, a Vital Implant Information form, it clearly states that the initial

28  stent that Dr. McKenna attempted to implant in Gary Morse was the Polyflex stent,

1   which is a silicone stent.   See Exhibit "I" to Fourth Supplemental Declaration of
2   Matthew L. Marshall in Support of Motion for Summary Judgment, and the Second
3   Supplemental   Declaration   of   Claude   Clerc   in   Support   of   Boston   Scientific
4   Corporation's Motion For Summary Judgment at 7:8-12.

5        This false testimony is critical as it goes directly to the issues of whether or not
6   Dr. McKenna really did in fact read the Instructions for Use, and to what extent any of
7   his testimony regarding his pre-treatment conclusions, knowledge or decisions can be
8   considered credible.   Moreover, Dr. Shuman bases material aspects of his opinions on
9   the false testimony of Dr. McKenna's sham declaration.   See Declaration of Robert L.
10  Shuman in Support of Plaintiff's Opposition to Motion for Summary Judgment at 3:16-
11  25, 4:1-12.   Moreover, Dr. Shuman admitted that he had not reviewed all of the Cedars
12  Sinai records, that he had not reviewed Dr. McKenna's declarations, and before his
13  deposition, that he had not seen the Vital Implant Information sheet, and which he
14  further admits contradict McKenna's testimony.   (Deposition of Robert Shuman, MD,
15  Exhibit "H" to Fourth Supplemental Declaration of Matthew L. Marshall at 85:13-17,
16  124:6-23, 125:1-3, 129:10-25, 130:1-12).   Clearly, the declaration and supplemental
17  declaration of Dr. McKenna are contrary to not only his prior testimony, but his own
18  medical records.  Both items of testimony should be excluded.

19  **VI.   VIRTUALLY ALL OF THE DECLARATIONS IN OPPOSTION TO THE**
20  **MOTION ARE INHERENTLY UNRELIABLE.**

21        A disturbing, yet undeniably apparent pattern has developed with regard to the
22  "testimony" and "evidence" that the Plaintiff has submitted in opposition to the Motion
23  for Summary Judgment.   Taken as a whole, and when combined with the numerous
24  excuses given by Plaintiff's counsel as to why extensions of time were needed or why
25  additional   evidence   should   be   allowed,   the   inescapable   conclusions   are   that   the
26  declarations are simply not factual, that the opposition has no merit, and that the Motion
27  should be granted.

28        First, the Plaintiff complained that the Court's re-scheduling of the hearing on the

1  Motion warranted more time for the Opposition to be completed.

2       Second, the Plaintiff wanted more time to address the contention that Mr. Agle
3  did not do his calculations correctly in regard to the alleged manufacturing defect,
4  despite attesting to the truth thereof in his declaration.  The opinions and statements by
5  Agle turned out to be false.

6       Third, the Plaintiff needed more time to address the contention that Dr. McKenna
7  had not read the Instructions for Use for the Wallstent®.  Initially, Dr. McKenna
8  testified that he could not recall *any* materials that specifically related to the Wallstent®
9  [Exhibit "B" to the Second Supplemental Declaration of Matthew L. Marshall at 35:6-
10 14], and further, that he did not discuss every potential risk with his patients [Exhibit
11 "B" to the Second Supplemental Declaration of Matthew L. Marshall at 121:13-22,
12 122:14-15].  This testimony was later contradicted by Dr. McKenna in his declaration
13 and supplemental declaration.

14      Fourth, the Plaintiff needed more time to re-address Mr. Agle's opinion that there
15 was a design defect in the fatigue cyclic testing for the Wallstent®.  The facts and
16 opinions that Mr. Agle finally submitted, were also false.

17      Fifth, Dr. McKenna falsely testified about his assessment of the risks associated
18 with metallic and silicone stents, and that his first choice of stent was the metallic
19 Wallstent®, as outlined herein.  These statements proved to be false, and to compound
20 matters, Dr. Shuman relied on these misstatements.

21      Either all of the witnesses are providing false testimony on key issues, or
22 alternatively, the Plaintiff is merely throwing up as many roadblocks as possible to this
23 Motion in an effort to confuse the issues, under the guise that disputed issues of material
24 facts remain unresolved.  This is simply not the case.  There is no evidence of a design
25 defect.   There is no evidence of a manufacturing defect.   There is no evidence of
26 reliance or causation on an alleged defective warning.  There is no expert to testify on
27 the adequacy of the warning.  Pure, plain, simple: the undisputed facts warrant the
28 granting of the Motion.

1

## VII. **CONCLUSION**

2     For all of the foregoing reasons, Defendant Boston Scientific Corporation's

3   Motion for Summary Judgment should be granted, in its entirety, as to all claims and

4   causes of action.

5                               Respectfully submitted,

6   Dated: August *12*, 2008      MORRIS POLICH & PURDY LLP

7

8

9                               By:

10                                  Matthew L. Marshall

11                               Attorneys for Defendant
                                BOSTON SCIENTIFIC CORPORATION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

L0134400                        -21-

## ELECTRONIC PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen (18) years and am not a party to the within action.

On August 12, 2008, pursuant to the Court's Electronic Filing System, I submitted an electronic version of the following document via file transfer protocol to ECF (Electronic Case Filing):

**BOSTON SCIENTIFIC CORPORATION'S FURTHER REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT [FRCP 56]UNDER SEAL**

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on August 12, 2008, at Los Angeles, California.

Barbara O'Camb

1

## PROOF OF SERVICE

2      I, the undersigned, an employee of Morris Polich & Purdy LLP, located at 1055 West

3      Seventh Street, 24th Floor, Los Angeles, California, 90017 declare under penalty of perjury
       that I am over the age of eighteen (18) and not a party to this matter, action or proceeding.

4      On August /2, 2008, I served the foregoing documents, described as BOSTON
       SCIENTIFIC CORPORATION'S FURTHER REPLY TO PLAINTIFF'S OPPOSITION
5      TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE,  PARTIAL
       SUMMARY JUDGMENT [FRCP 56]UNDER SEAL
6

7      on interested parties in this action by placing

8          ☐  the original of the document
           ☒  true copies of the document
9

10     in separate sealed envelopes addressed to the following party(ies) in this matter at the following
       address(es):

11     Thomas A. Brill, Esq.
       Law Office of Young & Nichols
12     1901 Truxtun Avenue
       Bakersfield, CA  93301
13     (661) 862-7911

14     ☒ BY U.S. MAIL  I deposited such envelope in the mail at Los Angeles, California.  The envelopes
       were mailed with postage thereon fully prepaid.
15

16     I am readily familiar with Morris Polich & Purdy's practice of collection and processing
       correspondence for mailing.  Under that practice, documents are deposited with the U.S. Postal
17     Service on the same day which is stated in the proof of service, with postage fully prepaid at Los
       Angeles, California in the ordinary course of business.  I am aware that on motion of party served,
18     service is presumed invalid if the postal cancellation date or postage meter date is more than one day
       after the date stated in this proof of service.

19     ☐ BY FEDERAL EXPRESS  I am familiar with the firm's practice of collecting and processing
20     correspondence for delivery via Federal Express.  Under that practice, it would be picked up by
       Federal Express on that same day at Los Angeles, California and delivered to the parties as listed on
21     this Proof of Service the following business morning.

22     ☐ BY FACSIMILE  I caused the above-referenced document to be transmitted via facsimile to the
       parties as listed on this Proof of Service.
23

24     [X] FEDERAL  I declare that I am employed in the office of a member of the bar of this court at
       whose direction the service was made

25     Executed on August /2, 2008 at Los Angeles, California.

26

27                                                  BARBARA O'CAMB

28

L:\WDDOCS\0873\62422\L0102322.DOC                    -1-

PROOF OF SERVICE